*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

*In re* BALOWSKI/CARNELL, Minors.

UNPUBLISHED
November 17, 2022

No. 361525
Eaton Circuit Court
Family Division
LC No. 20-020390-NA

Before: M. J. KELLY, P.J., and SHAPIRO and PATEL, JJ.

PER CURIAM.

Respondent appeals by right from the trial court order terminating her parental rights to her children, FB and JC, under MCL 712A.19b(3)(c)(*i*).[1]  For the reasons stated in this opinion, we affirm.

## I.  BASIC FACTS

On August 24, 2020, the Department of Health and Human Services, filed a petition seeking removal of FB and JC from respondent's care and asking the court to take jurisdiction over them under MCL 712A.19b(2).[2]  The petition included allegations of domestic violence, unstable and unsanitary housing, physical abuse against FB, and improper supervision.  Following a probable-cause hearing, the trial court authorized the petition.  Respondent later entered a plea

---

[1] The trial court also terminated the parental rights of the children's father under MCL 712A.19b(3)(a) and (c)(*i*).  He has not appealed that decision.

[2] Respondent has four children: HJ, FB, JC, and RE.  At the time that the petition was filed in this case, because of respondent's unstable housing, HJ was in a temporary guardianship with respondent's adopted mother.  RE was born during the pendency of the child protective proceedings involving FB and JC.  At the time of the termination hearing, RE had been removed from respondent's care and was placed in the same home as FB and JC; however, the goal in RE's case was reunification, not termination.

of admission to several allegations in the petition and she pleaded no contest to other allegations in the petition. The court accepted her plea and took jurisdiction over FB and JC.

Respondent's initial barriers to reunification included domestic violence, unstable housing, emotional instability, substance abuse, and parenting skills. Respondent was offered services to rectify those barriers, including a psychological evaluation, multiple referrals for counseling, drug screens, outpatient substance-abuse treatment, and parenting classes, but she only made minimal progress. Therefore, after FB and JC had been in care for approximately 16 months, petitioner filed a supplemental petition seeking termination of respondent's parental rights. Following the termination hearing, the trial court found by clear and convincing evidence that termination of respondent's parental rights was warranted under MCL 712A.19b(3)(c)(*i*)[3] and that termination of respondent's parental rights was in the best interests of FB and JC.

## II. BEST INTERESTS

### A. STANDARD OF REVIEW

Respondent argues that the trial court's best-interests decision was clearly erroneous.[4] This Court reviews for clear error a trial court's finding that termination of parental rights is in the best interests of the children. *In re A Atchley*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 358502); slip op at 6-7. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Sanborn*, 337 Mich App 252, 276; 976 NW2d 44 (2021) (quotation marks and citation omitted).

### B. ANALYSIS

"[W]hether termination of parental rights is in the best interests of the child must be proven by a preponderance of the evidence." *In re Moss Minors*, 301 Mich App 76, 90; 836 NW2d 182 (2013). "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re*

---

[3] On appeal, respondent does not challenge the trial court's finding that termination was proper under MCL 712A.19b(3)(c)(*i*). Accordingly, we will not address that part of the court's decision.

[4] Respondent's appellant lawyer argues that the trial court erred by finding that termination of the respondent's parental rights was "clearly not in the child's best interests." In doing so, respondent's lawyer cites a former version of MCL 712A.19b(5). In 2008, however, the legislature amended that part of MCL 712A.19b(5). See 2008 PA 199. The current version of the statute—and the version that was in effect at the time of the termination hearing in this case—provides that the trial court must find that "termination of parental rights is in the child's best interests" before it may order the termination of parental rights. See 2018 PA 58. The trial court in this case applied the correct standard. Accordingly, despite respondent's appellant's lawyer's failure argue that the best-interests decision was improper under the current version of MCL 712A.19b(5), we will address the challenge to the court's finding.

*Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (citations omitted). The trial court may also consider psychological evaluations, the child's age, a parent's continued involvement in domestic violence, and a parent's history. *In re Jones*, 286 Mich App 126, 131; 777 NW2d 728 (2009). "The focus at the best-interest stage has always been on the child, not the parent." *In re A Atchley*, ___ Mich App at ___; slip op at 7 (quotation marks and citation omitted).

On appeal, respondent contends that the trial court erred by terminating her parental rights to FB and JC because the children had a bond with her. The existence of a bond between a parent and a child, however, does not preclude a finding that termination is in the child's best interests. The best-interests determination is made based upon all available evidence, *id*., so the fact that some evidence—including the existence of a bond—may weigh against a finding that termination of a parent's rights is in the child's best interest is not dispositive.

In this case, the trial court found that respondent had "some bond" with her children. Testimony at the termination hearing showed that during in-person parenting time visits, FB would hug respondent and engage in similar behaviors and that JC would turn to respondent for aid and comfort. Moreover, the caseworker testified that when the children's foster family would take out or move a computer, the children would start asking if they were going to see respondent. The caseworker also stated that the children were excited to see respondent during parenting time visits. However, the trial court also found that the bond was diminishing. That finding was supported by the record. For instance, a CASA volunteer—a woman who met with the children at least one time per week—explained that FB would not talk about respondent outside of the parenting-time visits. She did not observe any bond between JC and respondent at the visits that she observed. Further, FB's therapist opined that FB lacked a bond with respondent because she just ran around the room, did not sit with respondent, talk to her, or bring her toys. In light of the evidence that the bond was diminishing, the trial court determined that the bond between respondent and the children was a neutral fact that did not weigh in favor of or against a finding that termination of respondent's parental rights was in the children's best interests. On this record, that finding was not clearly erroneous.

The court also found that there was a strong bond between the children and their foster parents. That finding was supported by testimony from multiple witnesses. The CASA volunteer testified that she met with the children at least one time per week, so she was able to observe them with their foster parents. FB referred to the foster parents as "mommy" and "daddy," gave them hugs and kisses, and would often say "I love you" to them. Likewise, JC demonstrated a strong bond with the foster family. The caseworker also described a strong bond between the children and their foster parents, noting that they appeared settled and comfortable with the placement.

The court found that the children also demonstrated a strong need for permanency and stability. The CASA volunteer testified that the children had night terrors. She also recounted an occasion when the foster parents had to take the children's sister to the hospital. After their foster parents departed, FB and JC repeatedly asked when their foster parents would return. JC settled down after she told him a couple of times that everything was okay and that they would return; FB continued asking until she was assured at bedtime that she would see her foster parents as soon as she woke up in the morning. FB's therapist likewise testified that there was a bond between FB and her foster parents. She also testified that JC currently understood that his foster mother was his primary caregiver. The caseworker noted that JC was clingy and needed to be constantly

soothed. She testified that FB had recently articulated that she believed that respondent did not miss her or love her.

FB's therapist testified that FB had disinhibited social disorder, stress trauma that was not related to any specific event, and that she struggled with having a secure attachment because she had been in so many placements. She added that the disinhibited social disorder was due to a lack of a primary caregiver. The therapist also stated that FB would hoard food, often ask where her foster mother was and what was happening, and would have night terrors. She observed that, in her current placement, FB's mental-health needs were being met, that her attachment to her foster family was growing, and that she was improving on her ability to interact with JC. She opined that FB would benefit from stability. In light of that unrefuted evidence, the trial court did not clearly err by finding that "nothing is more important to [the children] right now than their need for permanency, stability, and finality."

Indeed, the record reflected that respondent could not meet the children's need for permanency and stability because she continued to have barriers to reunification with the children. Her emotional stability was still an issue. She received a psychological evaluation in 2020 and was referred for mental health treatment. Her initial referral was to Community Mental Health (CMH) in August 2020, but the case was closed for lack of participation. She was then referred for mental-health services through Cherry Hill in September or November 2020; she was discharged in April 2021 due to lack of participation. In May or June 2021, respondent returned to CMH, but she was discharged after approximately three months. Respondent completed an intake with Guidance Center, but—contrary to her claim that she had a therapy session with Guidance Center—she did not attend any appointments. Because she did not attend any appointments, Guidance Center was unable to provide her with psychiatric care. Respondent did not take the medications that she was prescribed as directed. In January 2022, she survived a suicide attempt. She was admitted to a hospital for a couple of days before being transferred to a facility for inpatient psychological care. When she was released in February 2022, it was recommended that she participate in outpatient treatment. Respondent did not follow that recommendation.

Housing was also a concern that impacted respondent's ability to provide the children with permanency, stability, and finality. Respondent was evicted because of non-payment of rent. Before her eviction, a caseworker observed that the house was filthy and unsafe for children. The caseworker explained that there were trash bags piled three or four feet high with flies buzzing around, that there were guinea pig and rabbit pens constructed on the living room carpet that would be easy for children to access, that the house smelled like animals, that there were trash, debris, and other items everywhere, and that respondent and her husband slept on the couch because their bed was in such disarray. Moreover, after being evicted in December 2021, respondent lived in a vehicle or a hotel, then with a friend until her youngest child was born, then in a hotel or vehicle again, and, finally, in another rented apartment. At the time of the termination hearing, she was $1,200 behind in rent and her landlord had advised that if payment in full was not made she would be evicted.

Respondent's parenting skills continued to be a problem. Although she attended most parenting time sessions, she would frequently request that the visits—with her very young children—be held over Zoom. During in-person visits, she frequently struggled to manage the

children. At times, she would attend to one child and leave the other two unsupervised. She would also rely on the foster parents or caseworkers if they were in the room during in-person visits. In light of this evidence, the court's finding that the advantages of the foster home over respondent's home was "majorly in favor of the foster home," was not clearly erroneous.

Finally, respondent argues on appeal that termination of her parental rights was not in the best interests of FB and JC because there was an ongoing case with their baby sister, RE. She suggests that because reunification was still possible in that case, maintaining her parental rights to FB and JC was in their best interests. The record shows that FB and JC had a bond with RE, and FB's therapist opined that there might be issues for FB and JC in the future if respondent was reunified with RE while her parental rights to them were terminated. Despite that evidence, the court found that, although there was a chance that respondent might be reunified with FB and JC's baby sister, RE, in the future, the court found that termination of respondent's parental rights was nevertheless in FB and JC's best interests because of their "desperate" need for permanency. Given the significant evidence showing that FB and JC needed permanency and stability, the court's finding was not clearly erroneous.

Based on all available evidence, the trial court's finding that termination of respondent's parental rights was in the children's best interests was not clearly erroneous.

Affirmed.

/s/ Michael J. Kelly
/s/ Douglas B. Shapiro
/s/ Sima G. Patel